UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Robert P. Gallagher, et al.**

    **v.**                     Case No. 14-cv-115-PB
                                 Opinion No. 2015 DNH 207

**Funeral Source One Supply
and Equipment Co., Inc., et al.**


**MEMORANDUM AND ORDER**


Robert Gallagher and his firm, Instrument Design and Manufacturing Co. ("IDM"), sued Funeral Source One Supply and Equipment Co., Inc. ("FS1") and Affordable Funeral Supply, LLC ("AFS") for (1) patent infringement, (2) trade dress infringement, (3) violations of the New Hampshire Consumer Protection Act; and (4) unjust enrichment.  The defendants have moved for summary judgment.


## I.   BACKGROUND

Gallagher owns and operates IDM.  He also owns a design patent for a funeral industry product known as an "Injector Needle Driver."[1]  IDM sells Gallagher's patented driver and other funeral-related items.  At all relevant times, however, neither

---

[1] The parties also refer to injector needle drivers as "guns."  I follow their practice in this Memorandum and Order.

Gallagher nor IDM marked the driver with its patent number.[2]
Doc. No. 58-1 ¶9.

FS1 is a Tennessee corporation that buys and resells
products to retail customers in the funeral industry.  FS1's
president and sole employee is Tillman R. Ward.  AFS is a
Pennsylvania company that buys and sells funeral-related
products to distributors and retail customers.  AFS has three
employees, including its founder, Jonathan Klein.

In approximately February 2012, AFS began to sell injector
needle drivers virtually identical to Gallagher's patented
design.  AFS reportedly purchased the drivers (fifty in total)
from Ridan International, a Pakistan-based company.  Doc. No.
58-1 ¶¶11-18.  AFS marketed the drivers, which Gallagher alleges
are "counterfeit" or "knockoff" versions of his device, on its
own website, and on third-party websites, including eCrater.com
and Amazon.com.  Id. at ¶¶26, 29.  In total, AFS sold 48
allegedly infringing drivers.  Id. at ¶32.  AFS completed its
final relevant sale on January 21, 2014.  Id. at ¶28.

From some unspecified date until September 2011, FS1 bought
Gallagher's patented Injector Needle Drivers from IDM.  Id. at

---

[2] Gallagher is the sole owner of IDM. I hereafter refer to
plaintiffs collectively as "Gallagher."

¶36.  Beginning in February 2012, however, FS1 began buying the allegedly infringing drivers from AFS.  FS1 bought a total of 25 allegedly infringing drivers from AFS, and then resold them to other customers.  Id. at ¶¶27, 33.  FS1 made its last relevant sale on March 4, 2014.[3]

During a January 17, 2014 telephone conversation between Gallagher and Ward (FS1's president), Gallagher asked why FS1 had not purchased Gallagher's injector needle driver for several years.  The parties disagree on how the conversation proceeded thereafter.  According to the defendants, Ward responded "that FS1 had been purchasing needle injector guns elsewhere, because the price was better."  Doc. Nos. 58-1 ¶38; 35-2 ¶21 (Ward's affidavit).  Gallagher claims instead that Ward said that "he was not selling the counterfeit" (i.e. the driver that closely resembled Gallagher's design) and that the counterfeit was "a sample, [and] a piece of junk."  Doc. Nos. 79 ¶12; 58-7 at 3.

---

[3] Defendants support the facts set out in this and the above paragraph with citations to affidavits which, in turn, are supported by invoices and other documents.  Doc. No. 58-1 at 1-9.  Gallagher apparently disputes many of defendants' factual claims, but merely states that "Defendants failed to produce any discovery documents reflecting email or other correspondence to and from one another [or with Ridan], even though FS1 had previously been a prolific correspondent with Plaintiffs."  Doc. No. 79 ¶¶5-6.  This objection is inadequate as it fails to provide citations to record evidence showing the existence of a dispute regarding a material fact.  LR 56.1(b).

The parties agree, however, that "Gallagher told Ward that [Gallagher's] injector needle driver was patented," but that "Gallagher did not provide the [patent] number at that time." Doc. No. 79 ¶12.  The parties further agree that, later on January 17, Ward and Gallagher exchanged emails in which Gallagher thanked Ward "for the heads up on the Driver" and said "[d]on't forget to send me a picture of the driver and who's selling it."  Doc. Nos. 79 ¶12; 35-2 ¶25.

On March 1, 2014, Gallagher notified Amazon and eCrater by email that "the injector needles they were selling . . . were not genuine but were unauthorized copies of Gallagher's design." See Doc. Nos. 63-7 (Amazon correspondence); 63-8 (eCrater correspondence).  Gallagher included the driver's patent number in his complaints.  On March 3, 2014, eCrater forwarded Gallagher's complaint to AFS, and deactivated the driver's product page on its website.  See Doc. No. 63-8.

Three days later, on March 6, 2014, Gallagher emailed both FS1 and AFS, stating that "[i]t has come to [my] attention you have sold and are selling counterfeit copies of [my] patented 'Injector Needle Driver TM.' You must immediately stop selling the illegal copies and remove all [of my] products from your web site store and any other location where the counterfeit and or

4

[my] items are posted for sale."  Doc. No. 58-1 ¶42-43.

Thereafter, on March 8, 12, 18, 19, 20, 24 and 25, 2014,

Gallagher's wife, Christine Gallagher, tried to purchase a

driver from AFS.  AFS, however, cancelled all of Mrs.

Gallagher's orders.

     Gallagher and IDM brought this action on March 20, 2014.

AFS removed the image of the allegedly counterfeit driver from

its website on April 10, 2014.  Doc. No. 35-1 ¶49.


## II.  <u>STANDARD OF REVIEW</u>

     Summary judgment is appropriate when the record reveals "no

genuine dispute as to any material fact and [that] the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The evidence submitted in support of the motion must be

considered in the light most favorable to the nonmoving party,

drawing all reasonable inferences in its favor.  <u>See</u> Navarro v.

Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

     A party seeking summary judgment must first identify the

absence of any genuine dispute of material fact.  Celotex Corp.

v. Catrett, 477 U.S. 317, 323 (1986).  A material fact "is one

'that might affect the outcome of the suit under the governing

law.'"  United States v. One Parcel of Real Prop. with Bldgs.,

960 F.2d 200, 204 (1st Cir.1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  If the moving party satisfies this burden, the nonmoving party must then "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala—Gerena v. Bristol Myers—Squibb Co., 95 F.3d 86, 94 (1st Cir.1996); see Celotex, 477 U.S. at 323.

### III.   ANALYSIS

Gallagher's core claims are that the defendants infringed his design patent and his protected trade dress by selling the allegedly counterfeit drivers.  He also alleges that defendants violated New Hampshire's Consumer Protection Act by "passing off" the counterfeit drivers as IDM drivers.  Finally, he asserts that defendants are liable for unjust enrichment because they profited from the sale of the counterfeit drivers.

Defendants present different challenges to each of Gallagher's claims.  They argue that the patent infringement claim fails because Gallagher is not entitled to relief for the alleged infringements.  They contend that the trade dress claim fails because the driver's product design is not protectable

trade dress.  They argue that the Consumer Protection Act claim cannot succeed because defendants' alleged conduct does not qualify as the "passing off" of counterfeit goods.  Finally, they challenge the unjust enrichment claim by contending that it does not qualify as a distinct claim for relief.  I address each argument in turn.

**A.  <u>Patent Infringement</u>**

Gallagher seeks both damages for past infringements of his design patent and an injunction barring the defendants from infringing the patent in the future.  Defendants argue that they are entitled to summary judgment on this claim because Gallagher cannot prove that he is entitled to either form of relief, even if he could prove that defendants infringed the patent.[4]

1.  <u>Damages</u>

A patentee's claim for patent infringement damages is potentially limited by 35 U.S.C. § 287(a), the patent marking statute.  Section 287(a) requires a patentee to mark a patented product with certain information in order to put "the public [on constructive notice] that the goods are patented."  Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1340 (Fed. Cir. 2008).

---

[4] For purposes of the present motion, defendants do not challenge Gallagher's contention that their sales of the allegedly counterfeit needle drivers infringed his patent.

If the patentee fails to comply with § 287(a)'s marking requirements "the patentee is not entitled to receive damages for infringement that took place before the alleged infringer received actual notice of the infringement." Id.  Put another way, where a patentee inadequately marks his product, he may only recover damages for infringement occurring after the defendant received actual notice of his infringement.  See id. In the present case, the parties agree that Gallagher failed to comply with § 287(a)'s marking requirements.  See Doc. Nos. 58-1 at ¶9; 79 at ¶1.  Thus, Gallagher's claim for infringement damages turns on whether he can prove that defendants continued to infringe the patent after receiving notice of their alleged infringements.

Gallagher first contends that FS1 received actual notice that it was infringing Gallagher's patent during the January 17, 2014 telephone conversation between Gallagher and Ward, FS1's president.  I disagree.  Accepting Gallagher's version of the January 17 conversation as true, Gallagher's statements were insufficient to give FS1 actual notice.  Actual notice requires the patentee (at least) to "provide[] sufficient specificity regarding its belief that the recipient may be an infringer." Gart, 254 F.3d at 1346 (emphasis added).  Thus, merely stating

8

that a patent exists and giving an "admonishment not to infringe" is not enough.  Minks, 546 F.3d at 1376.

Here, Gallagher's statement that "the Driver was patented and that no one was authorized to make or sell copies" (doc. no. 79-4 ¶8) was, at most, an admonition not to infringe.  According to Gallagher's own affidavit, he did not tell Ward that he believed that the defendants might be infringing, let alone ask them to abate their infringement.  Doc. No. 79-4 ¶¶8-11.  Instead, he simply informed Ward that his design was patented. Id.  That statement, without more, is inadequate to provide actual notice.  See Amsted, 24 F.3d at 187 (concluding that a letter notifying the alleged infringer of the patentee's "ownership of the patent and generally advis[ing] companies not to infringe" was insufficient).

Gallagher next asserts that both defendants received actual notice "at the very least[] after March 1."  Doc. No. 63-1 at 5. Again, I disagree.  On March 1, 2014, Gallagher notified Amazon and eCrater by email that "the injector needles they were selling . . . were unauthorized copies of Gallagher's design." Id. at 3.  On March 3, 2014, eCrater forwarded Gallagher's complaint to AFS and deactivated the driver's product page on eCrater's website.  See Doc. Nos. 63-8; 35-1 at ¶30.  Gallagher

seems to assert, then, that the defendants received actual
notice when eCrater sent Gallagher's complaint to AFS on March
3.[5]

Federal Circuit precedent forecloses Gallagher's argument.
In <u>Lans v. Digital Equipment Corp.</u>, the Federal Circuit held
that the patentee himself must notify the infringer of his
alleged infringement. 252 F.3d at 1328. Thus, "notice from
someone closely associated with the patentee does not satisfy §
287(a)." <u>Id.</u> at 1327. In this case, therefore, a message from
eCrater could not provide actual notice to defendants because it
came from a third party, not the patentee.[6] <u>Id.</u> Moreover, it is
insufficient for Gallagher to show that defendants "knew" of
Gallagher's patent on March 1, because "knowledge" and actual

_____

[5] Although Gallagher contends that defendants received actual
notice on "March 1," he also notes "eCrater notified AFS of
[his] infringement claim" on March 3. Doc. No. 63-1 at 3, 5. It
is unclear, then, why Gallagher believes defendants received
notice on March 1 rather than March 3.

[6] The Federal Circuit adopted this bright-line rule for two
reasons. First, because "only the patentee has authority to
grant licenses or accept design changes to facilitate the
purposes of the notification requirement." <u>Lans</u>, 252 F.3d at
1327. And second, because a rule allowing third-parties to give
a patentee actual notice would create line-drawing difficulties
that "would present notable enforcement problems." <u>Id.</u> Both of
these policy justifications counsel that eCrater's message, even
though it incorporated Gallagher's words, could not give the
defendants notice.

notice are not the same.  To determine whether there has been
actual notice, I must "focus on the action of the patentee, not
the knowledge or understanding of the infringer."  Amsted
Indus., 24 F.3d at 187.  Thus, even if the defendants "knew" of
Gallagher's patent when they received the message from eCrater
on March 3, that does not mean that defendants had actual notice
on that date.

   Unlike his two prior arguments, Gallagher is correct that
both defendants received adequate notice on March 6.  On March
6, Gallagher emailed both Ward and AFS that, "[i]t has come to
[my] attention you have sold and are selling counterfeit copies
of [my] patented [driver]," and ordered defendants to "stop
selling the illegal copies" immediately.  Doc. No. 58-1 ¶¶42-43.
Gallagher thus stated with specificity that he believed that
defendants "may be infringers," informed defendants "of the
identity of the patent,"[7] identified the "activity that is

---

[7] Defendants argue that the March 6 emails were insufficient to
give actual notice because Gallagher did not provide the
driver's patent number, and therefore did not "identify" the
patent adequately.  Doc. No. 58-1 at 11.  Although I am aware of
the court's discussion in Apple, Inc. v. Samsung Electronics Co.
926 F. Supp. 2d 1100, 1113 (N.D.Cal. 2013) on this issue, I am
unaware of any Federal Circuit opinion explicitly holding that a
patentee must identify the relevant patent by patent number
(rather than, for instance, product name). Regardless, I need
not resolve this issue because I grant defendants' motion for
summary judgment.

believed to be an infringement" (i.e. selling counterfeit copies

of Gallagher's patented design), and demanded that defendants

stop infringing.  SRI Int'l, 127 F.3d at 1470.  Gallagher's

March 6 emails were therefore sufficient to give defendants

actual notice of their alleged infringements.

### a.  Infringement

Gallagher has proved that defendants received actual notice

of their alleged infringements as of March 6, 2014.  His proof

on this point does not save his patent infringement claim from

summary judgment, however, because he has not produced evidence

that he suffered compensable infringement damages after he

provided the required notice.  When I construe the evidence in

the light most favorable to Gallagher, it proves at most that

AFS completed its last sale of an allegedly infringing needle

driver on January 21, 2014,[8] and that FS1 completed its last sale

on March 4, 2014.[9]  Accordingly, there is no basis in the record

_____

[8] The parties disagree as to the facts surrounding this final AFS
sale.  Citing an AFS invoice, Gallagher argues that FS1 "ordered
seven more counterfeit injector needles from AFS" on January 21,
2014.  Doc. No. 63-1.  Defendants respond that FS1 placed its
final order in December 2013, but that AFS did not ship the
devices until January 2014.  Doc. No. 65 at 3.  Even accepting
Gallagher's interpretation, however, Gallagher has presented no
facts indicating that AFS made any sales after January 21, 2014,
let alone after March 6.

[9] Gallagher's associate, Mike McKerley, placed this final order

12

to award Gallagher lost profits for any infringing sales after
March 6, 2014.[10]

--------

on March 4, and received the allegedly infringing driver from
FS1 on March 6, 2014.  Doc. Nos. 58-1 ¶31; 79 ¶9; 79-4 ¶20.
Gallagher's briefing and response to interrogatories imply that
McKerley received the driver before Gallagher emailed FS1 and
AFS. Doc. Nos. 58-7 at 3; 63-1 at 3.

[10] A patentee may be able to recover damages even though he
cannot prove that an infringer sold an infringing product or
otherwise profited from his infringement.  35 U.S.C. § 284
entitles a patentee to a reasonable royalty when his patent is
infringed, regardless of whether the infringer was able to sell
the infringing product.  35 U.S.C. § 289 further provides that a
patentee may recover $250 for the infringement of a design
patent even if the infringer did not profit from the infringing
act.  In the present case, AFS admits that an image of the
allegedly counterfeit driver remained accessible on its web site
until April 10, 2014, a little more than a month after it
received actual notice of its alleged infringement.  Doc. No.
35-1 ¶49.  To the extent that this qualifies as offering the
displayed driver for sale, it could amount to an infringement of
Gallagher's patent that would entitle him to a reasonable
royalty or $250 even though no sales were made after notice of
infringement was received.  Here, I appreciate that "[a]t
summary judgment . . . a judge may only award a zero royalty for
infringement if there is no genuine issue of material fact that
zero is the only reasonable royalty." Apple Inc. v. Motorola,
Inc., 757 F.3d 1286, 1328 (Fed. Cir. 2014) (reversed on other
grounds).  Gallagher, however, has not based his opposition to
defendants' summary judgment motion on this possible act of
infringement.  Nor has he produced any evidence (and the record
contains no such evidence) to support a possible claim that the
posting of an image of an infringing driver on AFS's website for
approximately one month would entitle him to a measurable
royalty payment.  As a result, defendants have not had an
opportunity to address the issue and I decline to rule against
them on the basis of an argument that Gallagher has not
presented.

**B.    Injunctive Relief**

Gallagher next argues that he is entitled to an injunction barring defendants from infringing his patent in the future.

To obtain an injunction in a patent case, the "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

Historically, when asked to issue a permanent injunction, courts generally presumed irreparable harm "following judgment of infringement and validity [of the patent]." Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1148 (Fed. Cir. 2011). Since the Supreme Court's decision in eBay, however, the Federal Circuit has expressly held that the presumption of irreparable harm no longer applies.  Id. (confirming "that eBay jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief").  Instead, although past harm remains relevant for determining whether the patentee

14

"has suffered an irreparable injury," eBay, 547 U.S. at 391
(emphasis added), courts may no longer presume irreparable harm
from past infringements.  Robert Bosch LLC, 659 F.3d at 1148.

A court's power to issue an injunction in a patent case is
further limited by 35 U.S.C. § 283, which authorizes a court to
issue an injunction "to prevent the violation of any right
secured by the patent on such terms as the court deems
reasonable" (emphasis added).  As the Federal Circuit has
explained, under this provision, "[a]n injunction is only proper
to prevent future infringement of a patent, not to remedy past
infringement."  Spine Solutions, Inc. v. Medtronic Sofamor Danek
USA, Inc., 620 F.3d 1305, 1320 (Fed. Cir. 2010).  Accordingly,
Gallagher will not be entitled to injunctive relief on his
patent infringement claim unless he can prove that defendants
are likely to infringe his patent in the future if an injunction
is not issued.

Under the facts of this case, Gallagher has presented
insufficient evidence of likely future infringement.  First, as
explained above, all of defendants' (limited number of) sales of
the allegedly infringing driver occurred before defendants
received actual notice of their alleged misconduct.  Neither
defendant sold the allegedly infringing device after March 4,

15

2014.  Doc. Nos. 58-1 ¶31; 79 ¶9; 79-4 ¶20.  That final sale occurred, then, two days before defendants received actual notice of their infringement on March 6, and more than two weeks before Gallagher brought this action on March 20.  Second, although the evidence shows that AFS continued to post an image of the allegedly infringing driver on its website after receiving actual notice of infringement, AFS remedied that possible act of infringement on April 10, 2014, when the image was removed from the website.  Doc. No. 35-1 ¶49.  Finally, to the extent that Gallagher's allegation that defendants routinely infringe patent rights is adequately supported, he does not explain how this alleged pattern is sufficiently established to support a claim that defendants are likely to infringe his patent in the future.

This evidence, neither individually nor collectively, warrants the conclusion that defendants are likely to infringe Gallagher's patent in the future if an injunction is not issued. To the contrary, the facts suggest that both defendants took steps to abate their alleged infringement relatively quickly after receiving actual notice from Gallagher.  Permanent injunctive relief therefore is not justified in this case.

In summary, Gallagher has not presented a triable claim that he is entitled to any relief for the infringement of his design patent.  Accordingly, defendants are entitled to summary judgment on Gallagher's patent infringement claim.

## C.   **Trade Dress Infringement**

Gallagher claims that defendants infringed his trade dress by "willfully and deliberately" selling a product that "incorporate[s] and cop[ies]" Gallagher's driver design.[11]  Doc. No. 53 ¶¶ 54-77.  Defendants move for summary judgment, arguing that (1) Gallagher's claimed trade dress is not protectable, and (2) that Gallagher has failed to show the "likelihood of confusion" required for infringement.  For the reasons set forth below, I conclude that Gallagher has failed to show that his alleged trade dress is protectable, and grant defendants' motion for summary judgment.

Section 43(a) of the Lanham Act prohibits the use of "any word, term, name, symbol or device . . . which . . . is likely to cause confusion" as to a product's origin.  15 U.S.C. §

---

[11] Gallagher claims that the driver's "product design . . . constitutes protectable trade dress."  Doc. No. 53 ¶59.  That design includes "(a) an aluminum rectangular body; (b) aluminum handle grips; (c) squeeze trigger, (d) black plastic barrel; (e) stainless steel nose; (f) black plastic adjusting end cap; [and] (g) stainless steel spring clip for securing injector needles in Driver."  Id. ¶62.

1125(a)(1)(A); Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 37 (1st Cir. 2001).  The Lanham Act's protection extends to "trade dress," defined as "the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer."  Yankee Candle, 259 F.3d at 38 (quoting Chrysler Corp. v. Silva, 118 F.3d 56, 58 (1st Cir. 1997)).

To prevail on a § 43(a) trade dress claim, the plaintiff must prove both (1) that the dress is protectable, and (2) infringement.  Yankee Candle, 259 F.3d at 38.  Trade dress is protectable if it is: "(1) used in commerce; (2) non-functional, and (3) distinctive."  Id. (citing I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 36 (1st Cir. 1998).  To prove infringement, "the plaintiff must show that another's use of a similar trade dress is likely to cause confusion among consumers as to the product's source."  Yankee Candle, 259 F.3d at 38.

Defendants assert that Gallagher's claimed trade dress is not protectable in part because it is not distinctive.  Doc. No. 58-1 at 19-20.  In general, distinctiveness may be either "inherent," (i.e. "the intrinsic nature of the trade dress serves to identify a particular source") or "acquired," meaning that the dress has attained "secondary meaning".  Yankee Candle,

18

259 F.3d at 38 citing Wal-Mart Stores v. Samara Bros., Inc., 529 U.S. 205, 210-11 (2000).  A product design, however, is "distinctive, and therefore protectable, only upon a showing of secondary meaning." Wal-Mart, 529 U.S. at 216; see Yankee Candle, 259 F.3d at 40.  When, as in this case, a patentee contends that his "product design" is protectable trade dress, Doc. No. 58-1 ¶59, he must show that his design has acquired secondary meaning.[12]  See Wal-Mart, 529 U.S. at 216.

Secondary meaning exists where "the primary significance . . . in the minds of the consuming public is not the product but the producer." Lund, 163 F.3d at 42; see also J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition, § 15:8 (4th ed.) ("[a]ll that is necessary to establish a secondary meaning is that the ordinary buyer associates the [dress] with a single, albeit anonymous, source").  In the First Circuit, "[p]roof of secondary meaning entails vigorous evidentiary requirements." Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 181 (1st Cir. 1993).  Further, in cases where the alleged trade dress is a product design, the party

---

[12] Gallagher has suggested that the driver's design is "inherently" distinctive. Doc. Nos. 63-1 at 8; 53 ¶63. This argument is incorrect as a matter of law because a product design cannot be inherently distinctive. Wal-Mart, 529 U.S. at 216.

seeking to establish "secondary meaning faces a higher threshold." Yankee Candle, 259 F.3d at 43 n.12.

A plaintiff can demonstrate secondary meaning either directly, through customer surveys and testimony, or circumstantially, by pointing to evidence including "(1) the length and manner of the [trade dress's] use, (2) the nature and extent of its advertising and promotion, (3) the efforts made to promote a conscious connection between the [trade dress] and the product's source, (4) the product's established place in the market, and (5) proof of . . . intentional copying of the [trade dress]." Philbrick v. eNom, Inc., 593 F. Supp. 2d 352, 369 (D.N.H. 2009).  Despite these "rigorous evidentiary requirements," Gallagher has proffered virtually nothing to show that his driver is distinctive.

1.  Direct Evidence

With respect to direct evidence, Gallagher cites a single affidavit from Roger Gosselin, a New Hampshire funeral director. In his two-page affidavit, Gosselin identifies Gallagher's driver, notes that he has used the driver "for more than 10 years," and states that the driver's "design . . . is unique to one manufacturer, and [is] easily recognizable."  Doc. No. 63-12.  I find this evidence inadequate.

Gosselin's statement is not the kind of survey or testimonial evidence that courts typically find probative of secondary meaning.  See MJM Productions v. Kelley Productions, Inc., 2003 WL 22205129, *6 (D.N.H. 2003).  Again, secondary meaning exists where "the primary significance . . . in the minds of the consuming public is not the product but the producer."  Lund, 163 F.3d at 42 (emphasis added).  Thus, surveys or affidavits are probative of secondary meaning when they reflect a broad and unbiased swath of the relevant consumer population.  Gallagher, however, has provided no explanation as to how many consumers he interviewed, what questions he asked, or how he procured Gosselin's affidavit.  See MJM Productions, 2003 WL 22205129, *6; see also President & Trs. Of Colby Coll. V. Colby Coll. N.H., 508 F.2d 804, 809 (1st Cir. 1975) (crediting testimony of experienced surveyor who polled a representative sample of 500 people from across New England as probative of secondary meaning).  Moreover, even when I credit Gosselin's statement as true, one person's opinion says virtually nothing about whether Gallagher's design has acquired secondary meaning across the market.[13]  MJM Productions, 2003 WL

---

[13] Gosselin's affidavit itself says little about secondary meaning.  Gosselin states that Gallagher's "design . . . is unique to one manufacturer, and easily recognizable," but first

22205129, *6 (thirty-two affidavits too small a sample to be probative of secondary meaning); see also Genesis Strategies, Inc. v. Pitney Bowes, Inc., 50 F. Supp. 3d 59, 66-67 (D. Mass. 2014) (rejecting survey evidence where "the survey only questioned existing customers who are already familiar with Plaintiff's product").

   2.   Circumstantial Evidence

   Gallagher provides even less circumstantial evidence of secondary meaning.  Gallagher states that "[a]s a result of [his] continuous and exclusive use of the uniquely designed Injector Needle Driver, and [his] extensive promotion and distribution of the Injector Needle Driver, [his] Driver has acquired secondary meaning associated with [him] in the embalming industry."  Doc. No. 63-1 at 14.  He, however, cites no record evidence to support this broad assertion.[14]  Id.

---

identifies Gallagher's product by the name engraved on the driver – "Injector Needle Mfg. Co., New Hampshire, Patented." Id.  Gosselin's affidavit, then, does not necessarily mean that he associates Gallagher's design with a "single, albeit anonymous, source."  Instead, Gosselin may associate the design with IDM simply because IDM's name appears on the device.

[14] Gallagher might argue that the evidence that others have copied his trade dress shows that his design has acquired secondary meaning.  See Yankee Candle, 259 F.3d at 44.  I note, however, that "attempts to copy a product configuration will quite often not be probative [of secondary meaning because] the copier may very well be exploiting a particularly desirable

Comparing these facts to other cases addressing secondary meaning shows the inadequacy of Gallagher's proffer.  In Yankee Candle, for instance, the patentee supported its argument that its trade dress had acquired secondary meaning by pointing to concrete evidence of its significant advertising campaign, large sales numbers, defendant's internal documents "indicating that retailers identify a resemblance between" plaintiff's and defendant's product, and even testimony from defendant's own employees that they were instructed to mimic plaintiff's design. 259 F.3d at 43-45.  Yet, despite all of that evidence, the First Circuit held that plaintiff had failed to establish secondary meaning, and therefore upheld the granting of a motion for summary judgment.  Id.; see also Bern Unlimited, Inc. v. Burton Corp., 2015 WL 1442456 (D. Mass. March 31, 2015) (granting

---

feature, rather than seeking to confuse consumers as to the source of the product." Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd., 40 F.3d 1431 (3d Cir. 1994); see Yankee Candle, 259 F.3d at 45 ("the relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another").  Despite his conclusory allegation that "Defendants elected to match Plaintiffs' design down to the smallest detail" in order to "ride on the coattails of Plaintiffs' goodwill," Gallagher cites no record evidence to support his claim regarding defendants' intent.  See also Yankee Candle, 259 F.3d at 45 (finding testimony from defendant's employees that they were instructed to make their marketing materials look more like plaintiff's to be "troubling," but insufficient to establish secondary meaning).

summary judgment based on facts similar to those presented in
Yankee Candle).

    Compared to Yankee Candle, this is not a close case.  Other
than a single affidavit, Gallagher cites no evidence to show
that his design has gained secondary meaning.  In light of the
"rigorous evidentiary requirements" for establishing secondary
meaning, Gallagher has not done enough.  I therefore grant
defendants' motion for summary judgment on Gallagher's trade
dress infringement claim.  Yankee Candle, 259 F.3d at 45.[15]

**B.    New Hampshire Consumer Protection Act**

    Gallagher next brings a claim pursuant to § 358-A:2, I of
the New Hampshire Consumer Protection Act (CPA).  Doc. No. 53
¶40.  The CPA broadly proscribes "any unfair or deceptive act or
practice in the conduct of any trade or commerce within this
state," and enumerates a non-exhaustive list of such "deceptive
act[s] or practice[s]."  N. H. Rev. Stat. Ann. § 358-A:2.
Gallagher bases his CPA claim on RSA § 358-A:2, I, which
prohibits "[p]assing off goods or services as those of

---

[15] Because I conclude that Gallagher has not met his burden of
showing that his design is protectable, I need not address
defendants' further argument that there is no "likelihood of
confusion."

another."[16]  Id.; Doc. Nos. 53 ¶40; 63-1 at 6.  Defendants argue

that Gallagher's RSA § 358-A:2, I claim fails because (1) they

lacked the requisite intent for a CPA violation, and (2)

Gallagher has not presented evidence that defendants' conduct

caused any damage to Gallagher.[17]  Doc. No. 58-1 at 13-14.

---

[16] In their motion for summary judgment, defendants address what
they call "Plaintiff's 'Catch-All' Claim Under RSA 358-A:2."
Doc. No. 58-1 at 15.  As the defendants recognize, to determine
whether the CPA prohibits a non-enumerated act, courts apply
what the New Hampshire Supreme Court has called the "rascality
test."  Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 675
(2013).  To be actionable under the rascality test, the
challenged conduct "must attain a level of rascality that would
raise an eyebrow of someone inured to the rough and tumble of
the world of commerce."  Id. at 675-76 (internal quotation
omitted).  Gallagher, however, appears to base his CPA claim
explicitly, and exclusively, on § 358-A:2, I.  I proceed on that
assumption.  Moreover, even if Gallagher is making a "catch all"
CPA claim, that claim fails because Gallagher has not presented
evidence that defendants acted with the scienter required for
any CPA violation.

[17] Neither party addresses whether the CPA unfair competition
claim requires a different analysis than Gallagher's Lanham Act
claim.  In discussing this issue, this court has previously
stated that "[t]o succeed on this claim under either federal
[law] or [RSA 358-A:2], a plaintiff must show, first, that its
mark is distinctive, and, second, that the defendant's alleged
use of the mark is likely to cause confusion among consumers."
Ligotti v. Garofalo, 562 F. Supp. 2d 204, 214 (D.N.H. 2008)
(citing Auto Body Specialists, Inc. v. Vallee, 127 N.H. 382, 385
(1985); see Granite State Trade Sch., LLC v. New Hampshire Sch.
of Mech. Trades, Inc., 2015 DNH 151, 11.  Because defendants do
not raise this argument, however, I do not resolve the issue on
those grounds.  Likewise, I do not consider whether federal law
might preempt Gallagher's claim.  See Beckwith Builders v.
Depietri, 2006 DNH 106.

Because I agree that that Gallagher has presented insufficient evidence of scienter to establish a CPA violation, I grant defendants' motion for summary judgment as to this claim, and do not reach their second argument.

The New Hampshire CPA does not impose strict liability, but instead requires "a degree of knowledge or intent." Kelton v. Hollis Ranch, LLC, 155 N.H. 666, 668-69 (2007).  As such, defendants are not liable under the CPA for a "good faith mistake."  Id. at 669.  Further, although there are few cases specifically interpreting RSA § 358-A:2, I, commentators addressing state unfair competition law have explained that "the primary emphasis of 'passing off' is on the subjective mental intent of the defendant." 4 McCarthy on Trademarks and Unfair Competition § 25:2 (4th ed.); see Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 27 n.1 (2003) (discussing the concept of "passing off" generally and stating that "[p]assing off . . . occurs when a producer misrepresents his own goods or services as someone else's") (internal punctuation omitted and emphasis added).

Here, despite Gallagher's conclusory assertion that defendants acted "purposefully" (doc. no. 63-1 at 6), there is insufficient evidence that either defendant acted with the

scienter required for a CPA violation.  First, even assuming that the drivers that AFS and FS1 sold were "knockoff" versions of Gallagher's design, there is no evidence that defendants made those sales with the intention to mislead customers as to the drivers' origin.  Instead, the evidence again shows that all of AFS and FS1's sales of the allegedly infringing product occurred <u>before</u> they received legally adequate notice of their alleged infringement on March 6, 2014.  Doc. Nos. 58-1 ¶31; 79-4 ¶20. Second, to the extent that AFS continued to post a photograph of the "knockoff" driver after March 6, Gallagher presents no evidence that AFS did so with the desire to pass off the driver as Gallagher's own design.  Doc. No. 63-1 at 6.  The evidence here shows that, despite Gallagher's wife's repeated attempts to buy a driver from AFS after March 6, AFS cancelled all of those orders and removed the allegedly offending product from its website soon after this lawsuit was filed.  Doc. Nos. 58-1 ¶45; 35-1 ¶49.  Viewing all of this evidence, even in the light most favorable to Gallagher, it is simply insufficient to establish that either defendant acted with the requisite scienter for a CPA violation.  I therefore grant defendants' motion for summary judgment on this claim.

27

### C.   <u>Unjust Enrichment</u>

Finally, Gallagher appears to bring a separate claim for unjust enrichment, alleging that "Defendants have been unjustly enriched by selling injector needle drivers for a profit without consideration to" Gallagher.  Doc. No. 53 ¶49.  To support his claim, Gallagher argues that defendants sold a "pirated product that is an exact [but inferior] knockoff of [his] design," and thereby (1) deprived Gallagher of profits that he would have enjoyed from selling his own device, (2) injured Gallagher's reputation, and (3) unfairly expanded defendants' market share.  Doc. No. 63-1 at 7.  Gallagher, however, cites no record evidence to support these contentions.  <u>Id.</u>

Unjust enrichment is a narrow equitable remedy, and "generally does not form an independent basis for a cause of action." Gen. Insulation Co. v. Eckman Const., 159 N.H. 601, 621 (2010); <u>see</u> Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 669 (2013).  To recover for unjust enrichment, "[t]he party seeking restitution must establish not only unjust enrichment, but that the person sought to be charged had wrongfully secured a benefit or passively received one which it would be unconscionable to retain." Gen. Insulation, 159 N.H. at 621 (citation and punctuation omitted).

28

Defendants argue that Gallagher's unjust enrichment claim fails because (1) unjust enrichment is not a viable standalone claim, and (2) Gallagher has failed to "identify why Defendants' profits from their sales of needle injector guns were wrongfully secured, [and cannot] explain why Defendants' retention of their minimal profits would be unconscionable."  Doc. No. 58-1 at 13. With respect to this second argument, defendants further contend that, because § 287(a) bars Gallagher from recovering damages on his patent infringement claim, he cannot recover damages under an unjust enrichment theory.  Id.

In response, Gallagher apparently concedes that his unjust enrichment count is not a separate claim.  According to Gallagher, his "claim of unjust enrichment stems from Defendants' actions forming the basis of" Gallagher's other claims, and "is not meant to stand alone, but is a remedy that [he] seek[s] along with the others."  Doc. No. 63-1 at 7. Gallagher does not otherwise defend his claim.

Even if I were to accept that unjust enrichment is itself a viable cause of action, Gallagher's claim still fails.  The evidence here shows that defendants earned all of their minimal profits before receiving actual notice of their alleged infringement.  Thus, as explained above, whatever small amount

29

of money the defendants made from selling the allegedly infringing product, Gallagher cannot recover those profits under patent law.  See Wal-Mart Stores, 138 F.3d at 1446.  Gallagher has not explained why, after failing to comply with § 287(a)'s marking requirements, he should recover those same damages under an unjust enrichment theory.  Moreover, Gallagher provides no legal analysis or factual support to show why it would be "unconscionable" for defendants to keep those earnings.  Gen. Insulation, 159 N.H. at 621; see Doc. No. 63-1 at 7-8.  I therefore grant defendants' motion for summary judgment as to Gallagher's unjust enrichment claim.

## IV.  CONCLUSION

For the reasons set forth above, I grant defendants' motion for summary judgment (doc. no. 58) as to all of plaintiff's substantive claims.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

November 4, 2015

cc:  Ross Kenneth Krutsinger, Esq.
     Frank B. Mesmer, Jr., Esq.
     Laura L. Carroll, Esq.
     Zachary Rush Gates, Esq.
                              30